# United States Court of Appeals
### For the Eighth Circuit

_____

No. 13-1468

_____

Mike Townsend

*Plaintiff - Appellee*

v.

Bayer Corporation

*Defendant*

Bayer HealthCare Pharmaceuticals Inc.

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Pine Bluff

_____

Submitted: September 26, 2013
Filed: December 17, 2014

_____

Before RILEY, Chief Judge, BYE and GRUENDER, Circuit Judges.

_____

BYE, Circuit Judge.

Mike Townsend sued Bayer HealthCare Pharmaceuticals (Bayer) alleging Bayer wrongfully terminated him in violation of the whistleblower protection

provisions of the False Claims Act (FCA), 31 U.S.C. § 3730(h). A jury awarded Townsend $321,373 in back pay, doubled to $642,746 pursuant to the FCA, and $568,000 in emotional distress damages for a total recovery of $1,210,746. The district court denied Townsend's request for front pay and ordered Bayer to reinstate Townsend. Bayer appeals challenging the sufficiency of the evidence on a number of grounds. Bayer also contends Townsend's suit was time-barred, the district court committed evidentiary errors, the district court erred in reinstating Townsend, the back pay award was contrary to the evidence, and the emotional distress damages were excessive. We affirm in part, reverse in part, and remand.

I

We summarize the evidence presented at trial, viewing it in the light most favorable to Townsend. See Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005) (setting forth the standard of review for a challenge to the sufficiency of the evidence).

Townsend worked as a pharmaceutical sales representative for Bayer in Arkansas. His primary responsibility involved selling Mirena, a contraceptive device manufactured and sold by Bayer. As a sales representative, Townsend regularly visited a number of physicians, including Dr. Kelly Shrum. Dr. Shrum practiced at the Arkansas Center for Women in Pine Bluff, Arkansas. In January 2008, Townsend learned Dr. Shrum had been importing a version of Mirena from Canada that had not been approved by the Food and Drug Administration (FDA). Dr. Shrum obtained the non-FDA approved version of Mirena at half the cost of the version approved for sale in the United States. Townsend also learned Dr. Shrum had been submitting Medicaid claims to the government for this "gray market Mirena" at the same rate as the version of Mirena approved by the FDA. Dr. Shrum bragged about the $50,000 in profit he had made using the cheaper version of Mirena.

By the time Townsend learned about Dr. Shrum's fraudulent Medicaid claims, physician use of non-FDA approved Mirena was generally well-known by Bayer's sales force.  In a November 2007 email chain which included Townsend's superiors, the Mirena sales force discussed importation of the non-FDA approved version of Mirena by physicians and discussed the fact that physicians reimbursed by Medicaid for such contraceptives were committing Medicaid fraud.  After learning of Dr. Shrum's conduct, Townsend sought guidance from his superiors about what to do. Townsend asked his manager, Beth Whisenhunt, if he was required to report Dr. Shrum's overbilling to the government.  Whisenhunt never responded.

After Townsend did not receive a response from Whisenhunt, he and his fellow sales representatives continued to seek guidance from Bayer on how to deal with physicians submitting Medicaid claims for the price of the FDA approved version of Mirena but actually prescribing the less expensive non-FDA approved version. Bayer reacted by telling Townsend to focus on selling more Mirena, and not to get caught up with issues involving the non-FDA approved version of Mirena.

Eventually, however, Townsend called the Arkansas Attorney General's Medicaid Fraud Hotline to report Dr. Shrum's fraud even though he feared he might lose his job.  On April 1, 2009, Townsend spoke with Priscilla Kilgore, a senior investigator in the Attorney General's Medicaid fraud office.  Townsend anonymously told Kilgore that Dr. Shrum was overbilling the government for the non-FDA approved version of Mirena. Townsend requested anonymity because he feared losing his job.  Townsend also told Kilgore Dr. Shrum had bragged about $50,000 in profit he had made in his scheme to defraud the government.  Townsend's call quickly led to an investigation of Dr. Shrum by the FDA, the United States Attorney's Office, and the Arkansas Attorney General's Office.  Based on the information Townsend provided, a decision was made to execute a search warrant on the Arkansas Center for Women.

The government raided Dr. Shrum's clinic on June 17, 2009, and found the non-FDA approved version of Mirena. Dr. Shrum was subsequently charged with Medicaid fraud in the United States District Court for the Eastern District of Arkansas, and ultimately convicted of submitting false claims to the government. But for Townsend's whistleblowing, Dr. Shrum would likely have continued his scheme. Townsend cooperated fully with the government's investigation and prosecution of Dr. Shrum, which included the disclosure of his identity in the search warrant obtained for Dr. Shrum's clinic. Townsend believed he might face repercussions from Bayer for his role in the Shrum investigation, but nevertheless informed Whisenhunt he had reported Dr. Shrum to the authorities. Trent Erway, another Bayer employee, agreed Townsend should be concerned about his job.

Meanwhile, in 2009 Bayer changed the way it paid for expenses incurred by its sales force. Before the change, sales representatives submitted expenses to Bayer and Bayer would itself pay the representatives' company credit card bills. In February 2009, Bayer entered into an agreement with U.S. Bank to issue credit cards directly to Bayer's sales representatives. Expenses were still submitted to Bayer for approval, but, instead of paying the credit card bills directly, Bayer reimbursed each individual sales representative. The sales representatives then paid their own individual credit card bills using the funds provided by Bayer. Bayer was required to keep close track of these expenses because of the regulations imposed upon the pharmaceutical industry.

Some time after Bayer changed its credit card expense practices, Townsend's wife noticed the reimbursement funds Bayer had deposited into their checking account and, not knowing the funds were earmarked to pay the U.S. Bank credit card, used some of the money to pay other bills instead. Townsend got behind on his U.S. Bank payments as a result, and U.S. Bank closed his account in October 2009. In March 2010, Townsend used a bonus he received from Bayer to pay off the outstanding balance on his credit card account. On April 1, 2010, U.S. Bank reactivated

-4-

Townsend's account at the request of Lori Kushik, Bayer's Program Administrator for the U.S. Bank credit card program.

Even though Townsend's credit card account had been reactivated, Bayer fired him on May 5, 2010, claiming his closed credit card account did not allow him to perform his job because he could not entertain physicians. Three Bayer representatives met with Townsend – Blake Mounce, Townsend's supervisor; David Beasley, Bayer's Area Director; and John O'Donnell, a corporate human resources department employee. O'Donnell led the meeting and did most of the talking. He told Townsend he was being terminated because his U.S. Bank credit card had been deactivated, despite the fact that the account had been reactivated at Bayer's request over a month earlier. No one at the meeting asked Townsend about the outstanding balance on his company credit card. Likewise, no one confiscated Townsend's card even though there was a policy requiring them to do so.

On March 7, 2011, Townsend sued Bayer. He claimed Bayer terminated him for reporting Dr. Shrum to the authorities and for cooperating with the government's investigation and prosecution of Dr. Shrum. Townsend claimed his wrongful termination violated the anti-retaliation provisions of the FCA, 31 U.S.C. § 3730(h).[1] After discovery, the case proceeded to trial in October 2012.

---

[1]"A primary purpose of the FCA is to encourage whistleblowers to come forward with allegations of fraud perpetrated upon the government[.]" Roberts v. Accenture, LLP, 707 F.3d 1011, 1018 (8th Cir. 2013). To further this purpose, the FCA contains a provision which prohibits an employer from retaliating against an employee "because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1). At the time Townsend's claim accrued on May 5, 2010, the statute prohibited retaliation "because of lawful acts done by the employee . . . in furtherance of other efforts to stop 1 or more violations of this subchapter."

During trial, Townsend testified Bayer had an unwritten rule that its sales force should not report crimes of Bayer's physician customers to law enforcement. Indeed, when Whisenhunt was asked whether she would have reported Dr. Shrum's fraud like Townsend had, she said she would not have. When asked why not, she responded "I wouldn't, not unless the company told me to. . . . Even if I thought they were breaking [the law] – again, I follow rules. I'm not a rule breaker. I don't like to put myself in jeopardy, so I would not have turned anybody in." Jt. App. at 978.

Townsend's claim that Bayer had an unwritten rule not to report the illegal activities of its physician customers was also supported by the fact that two other sales representatives knew about Dr. Shrum's fraud, but did not report his crime. In addition, Tommy Gibbs, who supervised Townsend before Whisenhunt, admitted at trial that Bayer sales representatives were trained to report illegal activities to Bayer, not to authorities outside Bayer.

The district court also permitted Townsend to present evidence that Amber Jordan, an allegedly similarly-situated Bayer employee, had not been fired even though her credit card account had been deactivated but later reinstated like Townsend's. The district court refused, however, to allow Bayer to present evidence regarding Amy Kern, an employee Bayer claimed to be similarly situated to Townsend because she was fired for having a closed credit card account. The district court determined O'Donnell had failed to identify Kern as a comparator during his Rule 26 pre-trial deposition. Townsend also contends Kern was not similarly situated because her credit card account had been closed and remained closed, while his account had been reactivated at Bayer's request prior to his termination.

Also during trial, the jury heard O'Donnell had consulted Bayer's in-house counsel prior to meeting with Townsend to terminate him. The substance of the meeting was not disclosed, however, with Bayer citing attorney-client privilege. Bayer asked the district court to instruct the jury not to draw an adverse inference

from Bayer's assertion of the attorney-client privilege. The district court refused to so instruct the jury, instead advising Bayer's counsel he could cover the topic in closing argument.

Following the trial, the jury reached a verdict in favor of Townsend. The jury rejected Bayer's claim that Townsend had been legitimately fired over the credit card issue, and instead found Bayer had unlawfully fired Townsend for engaging in a protected activity by reporting Dr. Shrum's fraud and by cooperating with the government's investigation and prosecution. The jury awarded $321,373 in back pay (which was doubled to $642,746 pursuant to the FCA), and $568,000 for emotional distress damages, for a total recovery of $1.21 million. Bayer filed post-trial motions for judgment as a matter of law (JAML) on a number of grounds, as well as a motion for a new trial. Bayer also sought a remittitur of the emotional distress damage award contending the jury's award was excessive. The district court denied all of Bayer's post-trial motions. Townsend, in turn, filed post-trial motions for an award of front pay, attorney's fees and costs. The district court granted the request for attorney's fees and costs, but denied the request for an award of front pay and instead determined Townsend should be reinstated to his former job.

Bayer filed a timely appeal raising the following issues: (1) whether Townsend's suit is barred by the Arkansas statute of limitations applicable to public employee whistleblowers; (2) whether the evidence was insufficient to prove a causal connection between Townsend's termination and his report of Dr. Shrum's fraud, or to show Townsend engaged in a protected activity because his knowledge of fraud was stale by the time he reported it, or to show the decision-makers who terminated Townsend knew he engaged in a protected activity; (3) whether the FCA requires an employee to prove his employer was working in concert with a fraudulent actor to state a retaliation claim; (4) whether Bayer was unfairly prejudiced by the district court's evidentiary rulings regarding Bayer employees Jordan and Kern; (5) whether the district court abused its discretion when it failed to give a "privileged

communication" instruction to the jury; (6) whether the district court abused its discretion in ordering Bayer to reinstate Townsend; (7) whether the back pay award was contrary to the evidence; and (8) whether the district court erred in denying Bayer's motion for a new trial or remittitur because the jury's emotional distress damage award was excessive and motivated by passion or prejudice.

## II

### A

We first address Bayer's argument that Townsend's suit was barred by the 180-day statute of limitations set forth in Ark. Code Ann. § 21-1-604(a) for public employee whistleblowers. We review this issue de novo. Bldg. Erection Servs., Inc. v. JLG, Inc., 376 F.3d 800, 802 (8th Cir. 2004).

At the time Townsend was terminated in May 2010, the FCA had no specific statute of limitations for its retaliation provisions. Effective July 22, 2010, Congress amended the statute by adding subparagraph (3) to § 3730(h) which states "[a] civil action under this subsection may not be brought more than 3 years after the date when the retaliation occurred." There is no indication, however, Congress intended the amendment to apply to acts which occurred before its effective date.

Before Congress amended the statute, the Supreme Court instructed courts to look to the most closely analogous statute of limitations under state law to determine the time period for bringing a § 3730(h) retaliation claim. See Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, 545 U.S. 409, 422 (2005). In addition, the Supreme Court identified some likely analogous state limitations periods. See id. at 419 n.3. Notably, the most likely analogous limitation periods identified by the Supreme Court for the state of Arkansas were either the five-year catchall limitations period found at Ark. Code Ann. § 16-56-115, or the 180-day

limitations period applicable to public employee whistleblowers found at Ark. Code Ann. § 21-1-604. Id.

Townsend filed suit on March 7, 2011, more than 180 days after Bayer terminated him on May 5, 2010. Bayer therefore argues Townsend's suit should be barred by the 180-day period for public employee whistleblower claims under § 21-1-604.

The district court rejected Bayer's claim that the 180-day period applicable to public employees was the most closely analogous Arkansas statute of limitations, relying primarily upon the Fifth Circuit's decision in Riddle v. Dyncorp International Inc., 666 F.3d 940 (5th Cir. 2012). In Riddle, the Fifth Circuit determined Texas's 90-day limitations period for public employee whistleblowers did not govern an FCA retaliation claim. Id. at 942. The Fifth Circuit explained that the FCA plaintiff was not a public employee and could not bring an action under the public employee whistleblower statute. Id. The court noted Texas had adopted a number of whistleblower statutes with different limitations periods depending on "the employment field[] of the whistleblower" and that "it makes no more sense to borrow from the statute for public employees than it would to borrow from the statute for hospital employees, physicians, nursing home employees, agricultural laborers, or handlers of hazardous chemicals." Id.

The Fifth Circuit also mentioned public employees were required "to pursue an administrative remedy before suing under [Texas's whistleblower statute]" and thus the "limitations period . . . is often longer than 90 days because of the effect of required administrative proceedings." Id. at 943. As a result, the Fifth Circuit concluded Texas's general two-year period of limitations for personal injuries was more closely analogous to an FCA retaliation claim "because of its association with a particular type of wrongful discharge cause of action under Texas law." Id.

Similar to the Texas statute at issue in Riddle, Arkansas's Whistle-Blower Act only protects public employees. Townsend did not have a right to any of the protections of the Act, and could not sue under it. As Townsend argues, Arkansas's Whistle-Blower Act addresses a specific situation where the Arkansas General Assembly briefly waives the state's sovereign immunity to allow a public employee to sue in state court. Because of this departure from the general rule of sovereign immunity, it is understandable the Arkansas legislature imposed a short limitations period on the cause of action.

The 180-day period under § 21-1-604 should not determine the timeliness of Townsend's FCA retaliation claim because the protections of the FCA extend to "[a]ny employee," 31 U.S.C. § 3730(h)(1), not just those in the public sector. For an FCA retaliation claim brought by an employee in the private sector, more closely analogous Arkansas limitation periods include the five-year catchall provision at Ark. Code Ann. § 16-56-115, the one-year statute of limitations contained in the Arkansas Civil Rights Act at Ark. Code Ann. § 16-123-107(c)(3), or the three-year statute of limitations at Ark. Code Ann. § 16-56-105 applicable to liabilities created by statute. Because Townsend's suit was timely under any of those three statutes, we need not identify which one is the most closely analogous. It is enough to conclude Townsend's suit was not time-barred by § 21-1-604.

B

Bayer contends the district court erred when it denied Bayer's post-trial motion for JAML, arguing the evidence was insufficient on a number of grounds. We review these sufficiency claims de novo using the same standards as the district court, that is, "the evidence is viewed in the light most favorable to the prevailing party and the court can not weigh or evaluate the evidence or consider questions of credibility." Diesel Mach., 418 F.3d at 832. "A grant of JAML is proper only if the evidence

-10-

viewed according to this standard would not permit reasonable jurors to differ as to the conclusions that could be drawn." Id. (internal quotations and citation omitted).

To prove his FCA retaliation claim, Townsend was required to show (1) he engaged in conduct protected by the FCA; (2) Bayer knew he engaged in the protected activity; (3) Bayer retaliated against him; and (4) the retaliation was motivated solely by Townsend's protected activity. Wilkins v. St. Louis Hous. Auth., 314 F.3d 927, 932-33 (8th Cir. 2002). A plaintiff may prove a case with both direct and circumstantial evidence. United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714 n.3 (1983). When an employee presents evidence showing an employer's stated reason for taking an adverse action against him is pretextual, such evidence also serves to prove retaliation. See, e.g., Torgerson v. City of Rochester, 643 F.3d 1031, 1046 (8th Cir. 2011) ("Proof of pretext, coupled with a strong prima facie case, may suffice to create a triable question of fact.").

Bayer first argues the evidence was insufficient to prove a causal connection between Townsend's termination and (1) his report of Dr. Shrum's fraud, or (2) his subsequent cooperation in the investigation and prosecution of Dr. Shrum. Stated another way, Bayer claims Townsend did not present sufficient evidence of retaliation. We disagree.

The primary evidence Townsend presented to support his retaliation claim is what the parties refer to as the "culture of silence" evidence. Townsend's evidence showed Bayer encouraged its pharmaceutical sales representatives to report customer fraud to Bayer, not to the authorities. When Townsend reported Dr. Shrum's fraudulent conduct to Bayer, however, nothing happened. Indeed, Bayer actually told Townsend he should not worry about customer fraud, and instead focus on selling more product. Moreover, Townsend's supervisor, Whisenhunt, testified she would not report customer fraud to the government "unless the company told [her] to." She stated she was not a "rulebreaker" and did not "like to put myself in jeopardy, so I

-11-

would not have turned anybody in." From this evidence a jury could reasonably infer Bayer had a "rule" against reporting customer fraud, and the "jeopardy" an employee faced by reporting customer fraud was possible termination.

To further support his "culture of silence" claim, Townsend presented evidence that at least two other Bayer employees were aware of Dr. Shrum's fraud, but did not report it to authorities. In addition, Townsend presented evidence that other Bayer employees told Townsend he should be worried about his job for having reported a customer's fraud to the government. Finally, as discussed in more detail below in Section II(D), a jury could reasonably infer that Bayer's stated reason for terminating Townsend was pretextual. When viewing the evidence as a whole, a reasonable jury could infer Bayer had a culture of not reporting customer fraud to the government because doing so may harm customer relations and ultimately affect Bayer's profits, thus giving rise to a motive to retaliate against an employee who failed to play by Bayer's unwritten rule. When this is combined with evidence from which a reasonable jury could conclude Bayer's stated reason for terminating Townsend was pretextual, the overall evidence was sufficient to prove a causal connection between Townsend's termination and (1) his act of reporting Dr. Shrum's fraud to the authorities, or (2) his act of cooperating with the government's subsequent investigation and prosecution.

Second, Bayer contends Townsend did not present sufficient evidence that he engaged in a protected activity when he reported Dr. Shrum's fraud to the authorities. More specifically, Bayer argues when Townsend finally reported Dr. Shrum's fraud to the authorities in April 2009, he no longer had an objectively reasonable belief that Dr. Shrum was still defrauding the government at that time, i.e., his information was stale. See Wilkins, 314 F.3d at 933 (indicating an employee engages in a protected activity only if (1) he has a subjective good faith belief that fraud is being committed against the government, and (2) the belief is objectively reasonable under the circumstances).

At the time Townsend's claim accrued in May 2010, the FCA's retaliation provisions applied to "lawful acts done by the employee . . . in furtherance of efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1) (effective March 23, 2010, to July 21, 2010). Bayer argues the fifteen-month gap between Townsend's last visit to Dr. Shrum's office in January 2008 and his report of Dr. Shrum's conduct to authorities in April 2009 "eroded any possible reasonable basis Townsend may have had to believe fraud was [still] occurring" in order to "stop" a violation of the FCA. Appellant's Br. at 32.

Bayer thus essentially contends (without citing any cases) that the FCA's reference to "efforts to stop" violations requires fraud to be ongoing at the time a whistleblower reports the fraud. We do not need to decide this issue, because even if we assume the iteration of the FCA which applies here required Dr. Shrum's fraud to be ongoing when Townsend reported it, the evidence in this record permitted reasonable jurors to conclude Townsend had an objectively reasonable belief that Dr. Shrum's fraud was ongoing. When Townsend reported Dr. Shrum to the authorities in April 2009, Dr. Shrum was still not buying Mirena from Townsend. If Dr. Shrum had discontinued his practice of purchasing Mirena from Canada, the jury could reasonably infer Townsend would have gotten the physician's business back.

Bayer's argument about staleness fails in any event because the initial report of Dr. Shrum's fraud was not the only protected activity in which Townsend engaged. He also subsequently cooperated in the investigation and prosecution of Dr. Shrum. Where a whistleblower reports a completed act of fraud and subsequently cooperates in the investigation and prosecution of the wrongdoer, his conduct can fairly be said to be "in furtherance of efforts to stop" violations of the FCA. See United States ex rel. Schweizer v. Océ N.V., 677 F.3d 1228, 1237 (D.C. Cir. 2012) (indicating the retaliation provision of the FCA "was designed to protect persons who assist the discovery and prosecution of fraud and thus to improve the federal government's prospects of deterring and redressing crime") (citation omitted). A wrongdoer's

prosecution serves as a deterrent to others who may be contemplating the same conduct, but are discouraged by the successful prosecution. We therefore conclude Townsend presented sufficient evidence for a reasonable jury to find he engaged in a protected activity.

Third, Bayer contends Townsend did not prove the specific decision-makers who fired him knew he had engaged in a protected activity. As just stated, however, Townsend's cooperation in the investigation and prosecution of Dr. Shrum was a protected activity and O'Donnell admitted both he and Beasley (two of the three people involved in Townsend's termination) knew Townsend was involved in a "gray market" investigation at the time of the termination. "Gray market" was the term Bayer used when referring to physician customers who obtained non-FDA approved drugs from Canada. Indeed, O'Donnell testified the reason he consulted with Bayer's in-house counsel after Beasley told him Townsend was involved in a Mirena gray market case was because he "wanted to be sure [he] was taking the right steps." Jt. App. at 1048-49. This was sufficient evidence for a reasonable jury to find the decision-makers knew Townsend had engaged in a protected activity. See Schuhardt v. Wash. Univ., 390 F.3d 563, 568 (8th Cir. 2004) (discussing what a plaintiff must show to prove an employer had knowledge of protected activity for purposes of establishing an FCA retaliation claim).

C

Bayer also argues the district court erred in denying its motion for JAML because Townsend did not present any evidence Bayer was acting in concert with Dr. Shrum to defraud the government, or acting in concert with Dr. Shrum to retaliate against Townsend. Bayer essentially contends the FCA requires an employee to report his own employer's fraud – not merely a customer's fraud – before the employee can be considered to have engaged in a protected activity. We review this issue of

-14-

statutory construction de novo. Davey v. City of Omaha, 107 F.3d 587, 591 (8th Cir. 1997).

To determine whether the FCA limits retaliation claims to those situations where the whistleblower's employer is actively involved in defrauding the government, rather than merely engaging in the retaliation, we "first look to the language of the statute itself." Diesel Mach., 418 F.3d at 830 (citation omitted). "If the statutory language is unambiguous, our analysis need go no further and we simply apply the plain language of the statute." Id. at 831. The FCA is remedial in nature and thus we construe its provisions broadly to effectuate its purpose. See Tcherepnin v. Knight, 389 U.S. 332, 336 (1967).

In order to invoke the anti-retaliation provisions of the FCA, the statute's plain language states "any employee, contractor, or agent [must not be] discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment" for engaging in protected activity. 31 U.S.C. § 3730(h)(1). The words "protected activity" are not used in the FCA itself; this is a judicially-created phrase used to describe the conduct protected under the statute.[2] There is no dispute, however, that the statutory language referred to as "protected activity" (at least for purposes of this case) is any "lawful acts done by the employee . . . in furtherance of other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1) (effective March 23, 2010, to July 21, 2010).

The statute thus includes employees among the class of persons who may bring an FCA retaliation suit, but does not restrict the class of persons who may be violating the substantive provisions of the FCA to employers. Instead, the statute broadly protects any lawful acts done by an employee to stop violations of the FCA, and

_____

[2]It appears our circuit first used the term "protected activity" to describe the conduct protected under the FCA in Norbeck v. Basin Elec. Power Coop., 215 F.3d 848, 849 (8th Cir. 2000).

broadly prohibits the demotion, suspension, threatening, harassment, or other discrimination in the terms and conditions of employment against an employee for engaging in such lawful acts. Nothing in the plain language of the statute limits the protected "lawful acts" of an employee to efforts to stop *an employer's* violations of the FCA.

At least one court has specifically recognized the "statute . . . contains no language requiring proof that the retaliation was for protected activity involving false claims by that same employer." United States ex rel. Lang v. Nw. Univ., No. 04C3290, 2005 WL 670612, at *2 (N.D. Ill. Mar. 22, 2005); see also Nguyen v. City of Cleveland, 121 F. Supp. 2d 643, 649 (N.D. Ohio 2000) (finding the FCA's retaliation provision "reaches an employer who discriminates against an employee" for reporting the false claims of a customer). As Townsend argues, an employer may retaliate against an employee for reporting the fraud committed by its important customers irrespective of (a) whether the employer itself is engaged in the fraud, or (b) whether the employer acts in concert with the customer to retaliate against the employee.

For example, an employer may lose a customer's multi-million dollar account because an employee reports the customer's fraudulent activities to the government. The employer clearly has motive to retaliate against its employee under those circumstances. We therefore agree with Townsend that the protections of the FCA's anti-retaliation provisions should extend to such an employee, without requiring a showing that the employer itself was acting in concert with its customer to defraud the government, or acting in concert with the customer to orchestrate the retaliation.

D

Bayer also contends the district court should have granted its motion for a new trial based on alleged evidentiary errors. Bayer argues the district court should not

-16-

have allowed Townsend to present evidence that Amber Jordan was a similarly-situated Bayer employee who was not terminated, and should have allowed Bayer to present evidence that Amy Kern was a similarly-situated employee who was terminated.[3]

We review the district court's evidentiary rulings under an abuse of discretion standard. Diesel Mach., 418 F.3d at 833. With respect to Bayer's motion for a new trial, the district court is "in the best position to determine whether the alleged error affected the substantial rights of any party sufficient to warrant a new trial." O'Dell v. Hercules, Inc., 904 F.2d 1194, 1200 (8th Cir. 1990). The district court's decision therefore "deserves considerable deference." Id. The district court only abuses its discretion if "evidence of a critical nature is excluded and there is no reasonable assurance that the jury would have reached the same conclusion had the evidence been

---

[3]Evidence of similarly-situated comparators is part of the framework under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to show whether an employer's stated reason for taking adverse action against an employee is merely a pretext for unlawful retaliation. See, e.g., Ebersole v. Novo Nordisk, Inc., 758 F.3d 917, 925 (8th Cir. 2014) (explaining the multiple ways an employee may demonstrate pretext under McDonnell Douglas, which includes evidence "that similarly situated employees who did not engage in the protected activity were treated more leniently"). At least two circuits have specifically adopted the McDonnell Douglas framework for FCA retaliation claims. See United States ex rel. Schweizer v. Océ N.V., 677 F.3d 1228, 1241 (D.C. Cir. 2012); Harrington v. Aggregate Indus. Ne. Region, Inc., 668 F.3d 25, 30-31 (1st Cir. 2012). Although our circuit has not formally adopted the McDonnell Douglas framework for an FCA retaliation claim, both parties offered evidence of similarly-situated comparators as being relevant. Without adversarial briefing on the issue, we decline to decide at this time whether the entire McDonnell Douglas framework applies to an FCA retaliation claim, but nonetheless agree evidence of similarly-situated comparators is relevant to establishing the second two elements of an FCA retaliation claim, that is, whether the defendant retaliated against a plaintiff for engaging in protected activity, and whether such retaliation was motivated solely by the plaintiff's protected activity. See Wilkins, 314 F.3d at 933 (setting forth the elements of an FCA retaliation claim).

admitted." Harris v. Chand, 506 F.3d 1135, 1140 (8th Cir. 2007) (internal quotations omitted). Even if an abuse of discretion occurs, a trial court's ruling on a motion for new trial will only be reversed if "an evidentiary ruling was so prejudicial as to require a new trial which would be likely to produce a different result." O'Dell, 904 F.2d at 1200.

Bayer argues the district court abused its discretion when it allowed Townsend to offer evidence that Amber Jordan was a similarly-situated Bayer employee who was not fired. To present this evidence to the jury, Townsend had the burden to demonstrate by a preponderance of the evidence that Jordan was not disciplined in the same manner as Townsend was for comparable conduct. See, e.g., Doucette v. Morrison Cnty., Minn., 763 F.3d 978, 983 (8th Cir. 2014). Townsend was also required to show Jordan was "similarly situated in all relevant respects." Id. at 984 (quotation omitted). "The similarly situated co-worker inquiry is a search for a substantially similar employee, [however,] not for a clone." Ridout v. JBS USA, LLC, 716 F.3d 1079, 1085 (8th Cir. 2013) (quotation omitted).

The record shows that like Townsend, Jordan's credit card account had been closed because her account was over ninety days past due. Like Townsend, Jordan had received a P9 rating from U.S. Bank. Like Townsend, U.S. Bank informed Bayer it would not review Jordan's account to determine if her credit card could be reissued for a period of six months. And like Townsend, U.S. Bank reinstated Jordan's card before the six months passed. Thompson thus satisfied his burden of showing Jordan's credit card conduct was similar to his in all relevant respects.

In arguing the district court abused its discretion by admitting evidence of Jordan as a comparator, Bayer argues Jordan was not similar to Townsend because Jordan's supervisors knew her card had been reactivated, while the supervisors who terminated Townsend did not know his card had been reactivated. Bayer's alleged unawareness that Townsend's card had been reactivated goes to the issue whether

-18-

Bayer "in good faith believed that [Townsend] was guilty of the conduct justifying discharge." Pulczinski v. Trinity Structural Towers, Inc., 691 F.3d 996, 1002 (8th Cir. 2012) (quoting McCullough v. Univ. of Ark. for Med. Scis., 559 F.3d 855, 861-62 (8th Cir. 2009)). Bayer's alleged lack of knowledge of Townsend's reinstatement does not establish that the district court abused its discretion in allowing the admission of Jordan as a comparator, however, because there was evidence from which the jury could reject Bayer's good faith defense.

First and foremost, the record shows Bayer itself was the impetus behind Townsend's reinstatement. On April 1, 2010, Lori Kushik, Bayer's Master Card Program Administrator, used U.S. Bank's Access Online to ask U.S. Bank to reinstate Townsend's account. U.S. Bank reopened Townsend's account shortly thereafter. O'Donnell admitted he never bothered to confirm the status of Townsend's credit card account with Kushik prior to firing Townsend. From this evidence, at a minimum the jury could reasonably infer O'Donnell did not have a good faith belief that Townsend's account remained closed.

In addition, Kushik testified the type of credit card problems Townsend had with U.S. Bank were actually fairly typical among Bayer employees. Kushik estimated she dealt with between fifty and sixty account closures of Bayer employees on a monthly basis, and that "99 percent" of the accounts in a closed status for being ninety days past due (like Townsend's and Jordan's) were eventually reinstated. Furthermore, William Shank, Bayer's Vice President of Sales for Women's Healthcare, indicated that during his tenure with Bayer over a period of five to seven years, he had never known of anyone fired for a violation of the credit card policies, and O'Donnell admitted he had never fired any other employee for a similar reason. Finally, Townsend testified he was able to continue doing his job without a credit card; because of his long-standing relationships with his physician customers Townsend did not need to use a credit card to buy them lunch. Under these circumstances, there was strong evidence from which the jury could find pretext and reject Bayer's lack of

-19-

knowledge of the status of Townsend's credit card.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.").  The district court therefore did not abuse its discretion in allowing Townsend to present evidence that Jordan was a similarly-situated comparator who had not engaged in protected activity and who had been treated more leniently than Townsend.

Bayer also contends the district court abused its discretion when it refused to allow Bayer to present evidence that Amy Kern was a similarly-situated Bayer employee who was terminated for her credit card conduct.  The district court prohibited O'Donnell from testifying about Kern after he failed to identify her in his pretrial deposition when asked if he had fired anyone for a reason similar to that for which Townsend was terminated:

Q.    How many – while you were the associate director of human resources, how many representatives – sales reps or I should say employees in your division, it was like 500, I think you mentioned –

A.    Yes.

Q.    – how many folks did you terminate for a similar issue involving a credit card?

A.    None personally.

Q.    Okay.  This [Townsend] was the only one?

A.    Yes.

Jt. App. at 1024.  The district court found this response was evasive and that O'Donnell knew about Kern and should have reasonably answered otherwise.

-20-

Bayer challenges the district court's determination based on the disclosure of Kern as a comparator in interrogatory responses served prior to O'Donnell's Rule 26 deposition. Bayer also argues the district court should have determined the failure was harmless because O'Donnell's responses were "factually accurate." Appellant's Br. at 55. Another Bayer human resources representative, Anthony Kuhl, personally carried out Kern's termination, so Bayer claims O'Donnell's statement was accurate when he said he did not "personally" terminate anyone except Townsend because of a similar credit card issue.

It is unnecessary to address Bayer's arguments regarding the district court's discovery rulings. The district court did not abuse its discretion in excluding O'Donnell from testifying about Kern because she was not a valid comparator. Kern and Townsend were dissimilar in one key respect: Kern's credit card account was actually closed when Bayer terminated her, while Townsend's credit card had been reinstated – at Bayer's own request – prior to his termination.

E

Next, Bayer argues it is entitled to a new trial because the court did not give its proffered jury instruction on attorney-client privilege. The requested instruction would have informed the jury it "may not draw any adverse inference from Bayer's legitimate assertion of the attorney-client privilege" with respect to O'Donnell's contacts with Bayer's in-house counsel prior to terminating Townsend. Bayer contends Townsend's counsel referred to the privileged communications in his closing arguments, and by doing so asked the jury to draw an adverse inference from the fact that the communications had taken place. More specifically, Bayer claims Townsend's counsel suggested the communications showed O'Donnell knew Townsend's card had been reactivated, i.e., proved Bayer's stated reason for terminating Townsend was pretextual.

-21-

We review the district court's refusal to submit a proffered jury instruction for an abuse of discretion. The Shaw Grp., Inc. v. Marcum, 516 F.3d 1061, 1068 (8th Cir. 2008). The ultimate question is "whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury." Id. (internal quotations omitted). Jury instructions "do not need to be technically perfect or even a model of clarity." Cross v. Cleaver, 142 F.3d 1059, 1067 (8th Cir. 1998). Thus, before a litigant "is entitled to any relief on the ground that the trial court erred in giving or not giving an instruction, the error must be prejudicial." Id. We see no prejudicial error in this case.

A review of the closing argument shows Townsend's counsel referred to the privileged communications primarily to challenge O'Donnell's credibility, not to ask the jury to draw an adverse inference from the fact that privileged communications had taken place. Townsend's counsel challenged O'Donnell's claim that "he didn't know [Townsend] was involved in this [gray market Mirena case] when he made the decision [to terminate him]." Jt. App. at 695. The reference to the privileged communications in this context was a fair one, because O'Donnell admitted at trial the reason he contacted in-house counsel was because Beasley informed him Townsend was involved in a gray market Mirena investigation.

Townsend's counsel also referred to the privileged communications to challenge O'Donnell's claim that he did not know Townsend's card had been reactivated, asking the jurors to "use your common sense whether or not it was honest that there were over 20 contacts with the corporate legal counsel and corporate folks in the home office [before O'Donnell terminated Townsend]. . . . Clearly [O'Donnell knew [Townsend's] card was on." Id. at 694. To the extent these five lines in the middle of a thirty-page argument may have suggested the jury draw an adverse inference from the privileged communications, Bayer is not entitled to a new trial based upon the district court's refusal to give an adverse inference instruction.

-22-

First of all, any prejudice Bayer may have suffered would have been more directly related to the allegedly improper closing argument than to the court's chosen jury instructions. Yet Bayer never objected to the closing argument. Nor did Bayer ask the district court to give a curative instruction after counsel made his comment. Second, even if Bayer had lodged an objection and it had been overruled, counsel's brief isolated comment would not have not warranted a new trial. See, e.g., Cochenour v. Cameron Sav. & Loan F.A., 160 F.3d 1187, 1191 (8th Cir. 1998) (concluding an isolated remark made in the context of a lengthy argument was harmless error). As discussed above in Section II(D), there was other sufficient evidence from which the jury could reasonably infer O'Donnell did not have a good faith belief that Townsend's account remain closed. Townsend's counsel emphasized this and other evidence in asking the jury to find in his client's favor, and did not emphasize any alleged adverse inference from privileged communications. We therefore reject Bayer's claim that the outcome of the trial would likely have been different if the district court had given the requested instruction.

F

Bayer also contends the district court should not have ordered Bayer to reinstate Townsend. After trial, Bayer filed an affidavit signed by Beasley claiming Townsend would have been laid off on September 25, 2012 (about a month before trial), due to a corporate reorganization. As a result, Bayer argued the district court should not have reinstated Townsend because his position would have been eliminated even if he had not been fired.

We normally review the district court's decision to order reinstatement for an abuse of discretion, see Yancey v. Weyerhauser Co., 277 F.3d 1021, 1025 (8th Cir.

2002), because reinstatement, or front pay in lieu of reinstatement,[4] are forms of equitable remedies in an unlawful employment discrimination case. See, e.g., Newhouse v. McCormick & Co., 110 F.3d 635, 641-42 (8th Cir. 1997). The FCA, however, states relief in a successful retaliation claim "*shall* include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination. 31 U.S.C. § 3730(h)(2)(emphasis added). A statute's use of the word "shall" normally deprives a court of discretion in the matter referenced. See LeMay v. U.S. Postal Serv., 450 F.3d 797, 799 (8th Cir. 2006) ("Certainly, as a general rule of statutory construction, 'may' is permissive, whereas 'shall' is mandatory.") (citing Anderson v. Yungkau, 329 U.S. 482, 485 (1947)).

Although not in the context of an award of reinstatement, at least one circuit has determined § 3730(h)'s use of the word "shall" mandates awards of the relief listed therein. See Eberhardt v. Integrated Design & Constr., Inc., 167 F.3d 861, 872 (4th Cir. 1999) ("Section 3730(h) . . . does not provide for a discretionary award of [interest on the back pay]. Rather, use of the word 'shall' mandates such an award."); see also Yesudian ex rel. U.S. v. Howard Univ., 270 F.3d 969, 972 (D.C. Cir. 2001) (noting "all the § 3730(h) remedies are phrased in mandatory language (the employee '*shall be entitled*,' etc.)"); Kakeh v. United Planning Org., Inc., 655 F. Supp. 2d 107, 124 (D. D.C. 2009) (applying Yesudian to conclude "it is clear that the federal FCA

---

[4]Although the FCA does not explicitly authorize front pay in lieu of reinstatement, see Hammond v. Northland Counseling Ctr., Inc., 218 F.3d 886, 892 (8th Cir. 2000), the statute does entitle a successful plaintiff "to all relief necessary to make that employee . . . whole[.]" 31 U.S.C. § 3730(h)(1). Based on this "first remedial principle," at least one court in our circuit has concluded front pay can be awarded in lieu of reinstatement "in the appropriate case to effect the express Congressional intention that a claimant under § 3730(h) be made whole." Wilkins v. St. Louis Hous. Auth., 198 F. Supp. 2d 1080, 1091 (E.D. Mo. 2001). Because the district court chose reinstatement over front pay in this case, we need not address the question whether front pay is an appropriate alternate remedy in an FCA retaliation case.

creates a mandatory duty to award Plaintiff twice the amount of back pay awarded by the jury"). Both the district court and the parties operated below under the assumption the district court had discretion to choose between reinstatement or front pay as a form of equitable relief in an FCA retaliation claim. As a consequence, the question whether § 3730(h)'s use of the word "shall" mandates reinstatement was not addressed in the district court or briefed by either party on appeal.

We do not need to decide whether the statute mandates an award of reinstatement in this case. If the statute mandates reinstatement, the district court did not err in ordering reinstatement; if the district court had discretion, we conclude it did not abuse its discretion. In determining reinstatement was an appropriate remedy, the district court found Townsend was happy working at Bayer prior to his termination, his supervisors had no issues with his performance in sales, and there was no evidence his coworkers exhibited hostility towards him. The district court also referred to Bayer's own claim that, had it known Townsend's credit card had been reactivated, it would not have terminated him. Finally, the district court noted any hostility between Townsend and Bayer that may have been generated by the litigation between the parties was not a sufficient reason to bar reinstatement. Cf. Taylor v. Teletype Corp., 648 F.2d 1129, 1138-39 (8th Cir. 1981) ("To deny reinstatement to a victim of discrimination merely because of the hostility engendered by the prosecution of a discrimination suit would frustrate the make-whole purpose of Title VII. Antagonism between parties occurs as the natural bi-product of any litigation. Thus, a court might deny reinstatement in virtually every case if it considered the hostility engendered from litigation as a bar to relief.").

In support of its argument that the district court should not have reinstated Townsend, Bayer cites McKennon v. Nashville Banner Publishing Co., 513 U.S. 352 (1995). McKennon involved a claim under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634. The employer conceded it had violated the ADEA when it fired an employee, but she was denied all relief in her subsequent suit

-25-

because the employer later discovered evidence of wrongdoing that would have supported her termination in any event. In that context, the Supreme Court addressed whether reinstatement was an appropriate remedy and stated "[i]t would be both inequitable and pointless to order the reinstatement of someone the employer would have terminated, and will terminate, in any event and upon lawful grounds." 513 U.S. at 362.

Even if we assume McKennon applies in the absence of an employer's belated discovery of wrongdoing, Bayer's argument fails. The mere fact that Townsend's specific position would have been eliminated did not preclude the district court from awarding reinstatement. The FCA does not require reinstatement to the exact same position, but rather reinstatement to "the same seniority status that employee . . . would have had but for the discrimination." 31 U.S.C. § 3730(h)(2). The district court thus did not abuse its discretion in awarding reinstatement.

G

With respect to damages, Bayer first contends the district court erred by not remitting the jury's back-pay award on the grounds that Townsend failed to prove he mitigated his damages. "We review a district court's denial of a motion for remittitur regarding back pay for clear abuse of discretion." Chalfant v. Titan Distrib., Inc., 475 F.3d 982, 992 (8th Cir. 2007).

"When an employer makes a discriminatory employment decision against an individual, that individual has a duty to look for another position to mitigate his damages." Id. (citing Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc., 439 F.3d 894, 904-05 (8th Cir. 2006)). The duty to mitigate, however, does not require the individual to "go into another line of work, accept a demotion, or take a demeaning position." Canny, 439 F.3d at 904-05 (citing Hartley v. Dillard's, Inc., 310 F.3d 1054, 1061 (8th Cir. 2002)). In addition, an individual's efforts to mitigate do not have to

-26-

"be successful but must represent an honest effort to find substantially equivalent work." Hartley, 310 F.3d at 1061. The burden is upon the employer to prove a failure to mitigate. Chalfant, 475 F.3d at 992.

Bayer argues Townsend could have mitigated his damages simply by informing Bayer that his credit card had been reactivated. This argument is based upon Bayer's contention at trial that O'Donnell did not know Townsend's credit card had been reactivated, otherwise he would not have terminated Townsend. Bayer claims if Townsend had merely informed O'Donnell of the card's reactivation, Townsend would have gotten his job back.

The verdict in favor of Townsend shows the jury rejected Bayer's contention that O'Donnell did not know Townsend's credit card had been reactivated. As a result, Bayer's failure-to-mitigate argument necessarily fails. An honest effort to find substantially equivalent work can not be said to include an employee's failure to inform an employer about a matter the jury reasonably inferred was already within the employer's knowledge. Thus, the district court did not abuse its discretion by refusing to remit the back pay award.

H

Finally, Bayer challenges the jury's award of $568,000 in emotional distress damages. Bayer argues the district court should have either granted it a new trial because the verdict was motivated by passion or prejudice, or granted a remittitur because the damage award was excessive. We review a district court's decision to grant or deny a request for a remittitur for an abuse of discretion, keeping in mind a verdict is not excessive unless the result is monstrous or shocking. Thorne v. Welk Inv., Inc., 197 F.3d 1205, 1211 (8th Cir. 1999). In general, "awards for pain and suffering are highly subjective and should be committed to the sound discretion of the jury, especially when the jury is being asked to determine injuries not easily calculated

-27-

in economic terms." Frazier v. Iowa Beef Processors, Inc., 200 F.3d 1190, 1193 (8th Cir. 2000).

To support his claim for emotional distress damages, Townsend and his wife testified about the impact Bayer's termination had on their family's financial condition, and the shame and embarrassment Townsend felt because he could not provide for his family. Townsend presented evidence about losing his home through foreclosure, and being unable to provide basic necessities for his children. Townsend also presented evidence that he suffered from depression and sleeplessness in the roughly two and a half years between his termination and the trial. In declining to grant a remittitur, the district court relied heavily on the impact the termination had upon Townsend's financial condition, referring specifically to the fact that Townsend "lost his home, was unable to provide clothing and shoes for his children and could not pay for their education." Addendum at 14. At trial, however, Bayer established that Townsend began experiencing financial trouble before he was terminated. Townsend conceded the commencement of foreclosure proceedings on his house predated his termination. He also conceded he missed tuition payments for his children before he was terminated. Because it was clear that Townsend's financial difficulties started before his termination, we conclude the district court abused its discretion by relying upon that evidence when it declined to grant a remittitur.

When placing the financial difficulty evidence into proper context, we find the the jury's award of $568,000 for a two-and-a-half-year period of untreated depression and sleeplessness to be excessive as a matter of law. Unlike the cases where comparable awards have been upheld, Townsend's garden-variety evidence of emotional distress did not present the extraordinary circumstances which would have justified an award this large. See, e.g., Rowe v. Hussmann Corp., 381 F.3d 775, 783-84 (8th Cir. 2004) (concluding a district court did not abuse its discretion in denying a motion for a remittitur of a $500,000 award for emotional distress in a sexual

harassment case involving "months and years of unwanted touching and verbal abuse, combined with threats of murder and rape").

We therefore agree with Bayer the emotional distress award was excessive. We believe the evidence presented by Townsend justified an award no greater than $300,000. See Bennett v. Riceland Foods, Inc., 721 F.3d 546, 549, 551 (8th Cir. 2013) (affirming emotional distress damage awards of $300,000 to each of two individuals plaintiffs who "testified to depression, extreme stress, worry and sleeplessness"). Townsend has the option of accepting a remittitur of $300,000, or a new trial on the issue of emotional distress damages.

## III

We affirm the district court on all issues raised on appeal except the issue whether Bayer was entitled to a remittitur or new trial because the emotional distress damage award was excessive. On that issue, we remand to the district court where Townsend has the option of accepting a remittitur in the amount of $300,000, or a new trial solely on the issue of emotional distress damages.

_____