# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-3346

_____

Daniel Monohon

*Plaintiff - Appellant*

v.

BNSF Railway Company, a corporation

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: November 14, 2019
Filed: November 4, 2021

_____

Before COLLOTON, WOLLMAN, and BENTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Daniel Monohon worked as a railroad track inspector for BNSF Railway Company (BNSF) in southern Iowa. BNSF terminated his employment after Monohon took the position that wearing a seatbelt while traveling in a hy-rail vehicle was dangerous. Monohon thereafter filed suit, alleging that BNSF violated the Federal Rail Safety Act (FRSA) when it discharged him for reporting, in good faith,

a hazardous safety condition.  See 49 U.S.C. § 20109(b)(1)(A).  The district court denied BNSF's motion for summary judgment, and the case proceeded to trial.

A jury found in favor of Monohon and awarded back pay.  The district court denied Monohon's request for reinstatement and instead awarded three years of front pay.  The district court thereafter granted BNSF's motion for judgment as a matter of law, concluding that Monohon's "claim to have reported a hazardous safety condition is not objectively reasonable and is not supported by the facts of this case."  D. Ct. Order of Oct. 1, 2018, at 3–4.  We vacate the judgment in favor of BNSF, reverse the order granting BNSF's motion for judgment as a matter of law, and remand for the reinstatement of the jury verdict and for the entry of such further relief as is consistent with the views set forth in this opinion.

## I.  Background

A hy-rail is a pickup truck that can operate both on pavement and on railroad tracks.  It is equipped with conventional truck wheels with rubber tires, as well as with flanged steel wheels that fit on tracks.  To set a hy-rail on tracks, a track inspector drives to a crossing, lines up the rail wheels with the track, and then uses the hy-rail's hydraulic system to lower the rail wheels onto the tracks.  The inspector thereafter raises the truck wheels and locks the steering wheel.  Once a hy-rail is "set on," it does not require steering because the rail wheels follow the tracks.  Monohon testified that he operated his hy-rail at speeds ranging from a walking speed to twenty miles per hour.  With their steel wheels on steel tracks, hy-rails cannot stop quickly, particularly when the tracks are lubricated with oil or precipitation.  A hy-rail can be removed from the tracks only at crossings, at which the inspector lowers the truck wheels, raises the rail wheels, unlocks the steering wheel, and drives away.

Hy-rails have seatbelts like any pickup truck.  BNSF requires its employees to wear seatbelts when they operate hy-rails, with its rules instructing employees to

"[w]ear seat belts while operating or riding in equipment or vehicles that are equipped with them." BNSF did not consistently enforce the seatbelt rule, however, and BNSF employees did not always wear seatbelts while hy-railing. Before Monohon's termination, BNSF did not treat the failure to wear a seatbelt as a serious rules violation. BNSF instead had treated the failure to wear a seatbelt as an "operations test failure," with the discipline being coaching or counseling on the rule.

During a conference call on September 4, 2012, Roadmaster Tyson Pate reiterated the seatbelt rule, reminding his employees that they were required to wear seatbelts when operating hy-rails. Pate explained that there recently had been two serious accidents involving BNSF hy-rails running into the back of trains. A track inspector operating a hy-rail had died in a July 2012 collision, and another track inspector had been badly injured in an August 2012 collision. Neither inspector had been wearing his seatbelt at the time of his accident.

After hearing Pate's directive and briefing, Monohon expressed his concern about wearing a seatbelt while hy-railing, saying, "I just don't feel the seat belt rule is safe. . . . [I]f there's a train coming down the tracks at you and you don't have a chance to bail out, what's going to happen? You're going to get killed." Pate responded that he understood the concern, but that the seatbelt rule must be followed. According to Monohon, Pate did not mention that a seatbelt rule violation would be treated as a serious rules violation, nor was there any discussion regarding possible discipline. Monohon completed his regular work day after the conference call ended.

Monohon was tasked with moving slow order boards the next day. Slow order boards are trackside postings that indicate when a train must slow down and when it is safe to resume full speed. Monohon set his hy-rail on the tracks and traveled west. He exited and entered his hy-rail several times as he adjusted the boards.

Monohon stopped his hy-rail after being waved down by Steve Anderson, who was then Line Chief, and Michael Paz, who was then Assistant Roadmaster. When Anderson remarked that Monohon was not wearing his seatbelt, Monohon looked down and realized that he was not doing so. Anderson testified that Monohon seemed surprised. Monohon admitted his oversight to Anderson, explaining that he had fastened his seatbelt when he entered his hy-rail that morning, but that he had been in and out of his hy-rail several times that day. Anderson mentioned the recent hy-rail accidents and asked Monohon to fasten his seatbelt, which he did.

After telling Monohon that he would receive an operations test failure, Anderson asked Monohon to commit to wearing the seatbelt in the future. Monohon replied that he worried that his fastened seatbelt would prevent him from being able to quickly bail out of the hy-rail if a train approached. At that point, Anderson ended the conversation and sent Monohon home for the day. Anderson testified at trial that Monohon did not raise his voice, become argumentative, or disobey any orders during their conversation. After sending Monohon home, Anderson emailed Timothy Knapp, who was then Director of Line Maintenance. Anderson explained that he had stopped Monohon, who had not been wearing his seatbelt, and that although they "had a good discussion, . . . it became apparent any compliance around system expectations was going to be a struggle."

Knapp decided to initiate a formal investigation and to withhold Monohon from service. The purpose of the investigation was to determine whether Monohon had failed to wear his seatbelt and whether he had been "insubordinat[e] towards an officer while discussing the alleged violation on September 5, 2012." According to BNSF, insubordination toward an officer is an "act of willfully disobeying an authority."

Pate, Paz, and Monohon testified at the investigative hearing. Pate testified that he himself had "been guilty . . . of hy-railing without a seatbelt on," but that

everyone was required to follow the seatbelt rule after the September 4 briefing. Pate explained that Monohon believed that it was unsafe for him to wear his seatbelt, but never said that he would not follow the seatbelt rule. According to Paz, Monohon was not insubordinate, but was removed from service because he did not fully commit to wearing his seatbelt in the future. Monohon testified that he had told Anderson that he disagreed with the rule, because he would be unable to bail out of the hy-rail if a train approached, but that he understood that "we have to wear [seatbelts] and that's fine. I'm okay with that." The hearing officer found that "[b]y engaging in a discussion with Mr. Andersen (sic) about his objection to the [seatbelt] rule, Mr. Monohon increased his culpability from being 'minor oversight' as argued by the [union] to the more serious charge of insubordination." The hearing officer recommended that Monohon be suspended or dismissed.

After reviewing the transcript and exhibits, considering the hearing officer's findings and recommendations, and discussing discipline with other management personnel, Knapp decided to terminate Monohon for failing to wear his seatbelt and for insubordination towards Anderson. Knapp believed that Monohon's failure to wear a seatbelt was a serious rules violation and that his failure to commit to wearing his seatbelt constituted insubordination. When asked whether he had intentionally retaliated against Monohon for raising his concern about being unable to bail out of a hy-rail, Knapp replied, "No."

Monohon filed suit in federal district court. In its motion for summary judgment, BNSF argued that Monohon had not reported a hazardous safety condition but had instead objected to a longstanding safety rule. BNSF claimed that allowing Monohon's claim to proceed would hamper the railroad's ability to enforce its safety rules, giving as an example the following hypothetical situation:

> [A]n employee disagrees with the railroad's rule requiring him to wear
> a hard hat. His rationale: vision and alertness are hampered by the hard

hat. If Plaintiff's argument is accepted, this employee can run to the courts when he is disciplined for failing to wear a hard hat in violation of the railroad's rule.

BNSF further argued that Monohon's willingness to wear a seatbelt "negate[d] any contention that wearing a seatbelt could be reasonably construed as a hazardous safety or security condition." In denying the motion, the district court found BNSF's example inapposite because Monohon had allegedly reported a hazardous safety condition and had not refused to follow the rule. The court concluded that the statute did not require Monohon's report to be correct or objectively reasonable.

During the subsequent four-day jury trial, Monohon presented evidence that wearing a seatbelt when hy-railing constitutes a hazardous safety condition because it delays or prevents the seatbelt-restrained person from bailing out of the hy-rail. BNSF presented evidence that its seatbelt rule ensures the safety of its employees because seatbelts prevent injury and death. The district court denied BNSF's motion for judgment as a matter of law, which argued that Monohon had failed to identify any hazardous safety condition.

The court instructed the jury that "[t]he plaintiff reported a hazardous safety condition in good faith if, at the time he made the report, he genuinely believed he was reporting a hazardous safety condition." BNSF's proposed jury instructions did not address the meaning of "hazardous safety condition," nor did BNSF object to this portion of the instruction.

During its closing argument, BNSF argued that Monohon had not reported a hazardous safety condition, but rather a hypothetical concern that he had imagined:

> A hypothetical is not a condition. A condition must exist. A condition must be something you can see. A condition must be something you can report to the railroad. A condition must be something the railroad can

fix. . . . Expressing a concern about a hypothetical is not reporting a hazardous safety condition.

The jury's May 20, 2016, verdict rejected BNSF's argument, finding instead that Monohon had "reported, in good faith, a hazardous safety condition" and that BNSF would not have terminated Monohon's employment had he "not reported a hazardous safety condition." It awarded Monohon $500,000 in lost wages, lost benefits, and emotional distress damages. The district court's December 27, 2016, orders awarded front pay in the amount of $301,734, as well as attorneys' fees and costs. Judgment was entered a few days later.

BNSF renewed its motion for judgment as a matter of law and moved, in the alternative, for a new trial on January 24, 2017. The district court granted BNSF's motion in October 2018, concluding that Monohon's report was not objectively reasonable and that the jury's verdict was not supported by the evidence. "The plaintiff simply did not want to wear his safety belt while hy-railing for the BNSF." D. Ct. Order of Oct. 1, 2018, at 4. The court ruled that it would have granted a new trial, had it not granted BNSF judgment as a matter of law. It set aside the December 30, 2016, judgment in favor of Monohon and ordered that judgment be entered in favor of BNSF.

## II. Discussion

### A. Timeliness

Monohon argues that BNSF's renewed motion for judgment as a matter of law was untimely. Under Federal Rule of Civil Procedure 50(b), a movant must file any renewed motion for judgment as a matter of law "[n]o later than 28 days after the entry of judgment." Rule 58(a) requires that "[e]very judgment . . . be set out in a separate document." The district court ordered that judgment be entered after the

court had denied reinstatement and instead had awarded front pay. The clerk of court entered judgment by separate document on December 30, 2016. BNSF's January 24, 2017, renewed motion thus fell within Rule 50(b)'s 28-day time period.

We reject Monohon's argument that judgment was entered as a matter of course on October 17, 2016—150 days after the jury's verdict was recorded on the docket. Under Rule 58(c)(2), when no separate document is filed, judgment "is deemed 'entered' 150 days after the dispositive order was entered on the civil docket." Osher v. City of St. Louis, 903 F.3d 698, 701 (8th Cir. 2018) (quoting Jeffries v. United States, 721 F.3d 1008, 1012 (8th Cir. 2013)). Even assuming that a jury verdict could trigger Rule 58(c)(2)'s time period, the verdict here could not have done so because the jury did not decide all of the issues in the case—specifically, Monohon's request for reinstatement. See Bankers Tr. Co. v. Mallis, 435 U.S. 381, 384 n.4 (1978) ("A 'judgment' for purposes of the Federal Rules of Civil Procedure would appear to be equivalent to a 'final decision' as that term is used in 28 U.S.C. § 1291."); Patterson v. City of Omaha, 779 F.3d 795, 800 (8th Cir. 2015) ("A final decision is ordinarily one which disposes of all the rights of all the parties to an action." (internal quotation marks and citation omitted)); Dieser v. Cont'l Cas. Co., 440 F.3d 920, 923 (8th Cir. 2006) ("A final decision within the meaning of § 1291 ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." (internal quotation marks and citation omitted)). Judgment thus was not entered as a matter of course under Rule 58(c)(2), and BNSF's renewed motion was timely.

### B. Renewed Motion for Judgment as a Matter of Law

Monohon argues that the district court erred in granting BNSF's renewed motion for judgment as a matter of law. We review *de novo* the grant of a renewed motion for judgment as a matter of law, viewing the evidence in the light most favorable to the verdict. See S. Wine & Spirits of Nev. v. Mountain Valley Spring

Co., 646 F.3d 526, 533 (8th Cir. 2011). "Judgment as a matter of law is only appropriate when no reasonable jury could have found for the nonmoving party." Id. In reviewing the district court's decision, "we may not weigh the credibility of evidence, and conflicts in the evidence must be resolved in favor of the verdict." Id.

The FRSA prohibits railroads from retaliating against their employees for "reporting, in good faith, a hazardous safety or security condition." 49 U.S.C. § 20109(b)(1)(A). To decide this appeal, we must discern the meaning of the statutory language and determine whether there existed a "legally sufficient evidentiary basis to find" that BNSF violated the statute. See Fed. R. Civ. P. 50(a)(1). As set forth above, the district court determined that the statute required Monohon's report to be objectively reasonable and that Monohon had failed to prove that it was indeed so.

As an initial matter, the statute requires only that the employee report "in good faith," meaning "honestly and frankly, without any intent to defraud." See Acting in Good Faith, Black's Law Dictionary (11th ed. 2019). The statute's plain language thus does not require that the report be objectively reasonable, and we decline to read a reasonableness requirement into the "reporting, in good faith" provision. See Ziparo v. CSX Transp., Inc., 15 F. 4th 153, 155 (2d Cir. 2021) (holding that "'good faith' as used in the FRSA requires only that the reporting employee honestly believe that what she reports constitutes a hazardous safety or security condition").

The statute indicates that Congress purposefully omitted a reasonableness requirement from the reporting provision. For example, the refusal-to-work provision that immediately follows the reporting provision requires objective reasonableness. That provision prohibits retaliation against an employee for "refusing to work when confronted by a hazardous safety or security condition." 49 U.S.C. § 20109(b)(1)(B). An employee's refusal is protected only if it "is made in good faith and no reasonable alternative to the refusal is available," Id. § 20109(b)(2)(A), and:

(B)  a reasonable individual in the circumstances then confronting the employee would conclude that—

(i)  the hazardous condition presents an imminent danger of death or serious injury; and

(ii)  the urgency of the situation does not allow sufficient time to eliminate the danger without such refusal . . . .

Id. § 20109(b)(2)(B). The refusal-to-work provision's explicit requirement of reasonableness reflects Congress's decision to omit reasonableness in the reporting provision. Had Congress intended the FRSA to protect only objectively reasonable reports of hazardous safety conditions, it would have done so expressly.[1] See Russello v. United States, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (alteration in original) (citation omitted)); Ziparo, 15 F.4th at 161 ("Had Congress intended to include an objective reasonableness requirement in § 20109(b)(1)(A), it knew how to do so. But it did not include that requirement.").

This broad anti-retaliation protection for good faith reports accords with the statute's purpose. The FRSA was enacted to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. It empowers employees to make good faith reports of hazardous safety conditions without fear of retaliation. Such reports may prompt the railroad to take action to

---

[1]The FRSA's anti-retaliation provision for "refusing to authorize the use of any safety-related equipment" also includes a reasonableness requirement. See 49 U.S.C. §§ 20109(b)(1)(C) and (b)(2)(A)–(B).

remedy the condition. Such reports alternatively could result in the expenditure of management's time in explaining to the reporting employee why a condition is actually safe or in investigating a reported condition, only to find that all is in good order. E.g., Kuduk v. BNSF Ry. Co., 768 F.3d 786, 789 (8th Cir. 2014) (railroad investigated an employee's report, found that the condition was safe, and closed the investigation). As the statute makes clear, however, Congress decided that the benefits of protecting these good faith reports outweighed any cost of their protection. See Neal v. Honeywell, Inc., 33 F.3d 860, 862 (7th Cir. 1994) ("The text of the law is not just evidence about how much one interest (here, the government's in obtaining information by relieving employees of fear) should be preferred over another (here, the employer's in managing its labor force); the text is the *decision* about what to do—a decision approved by the Constitution's own means, bicameral approval and presidential signature.").

We agree with the Court of Appeals for the Second Circuit's recent decision in Ziparo v. CSX Transportation, Inc., that "a mere report of a putative safety violation to the railroad itself, even if mistaken, imposes no meaningful costs on the railroad." 15 F.4th at 162. The FRSA's protection of a reporting employee likewise imposes no "unreasonable burdens or costs" because the statute does not require the railroad to take remedial action in response to the employee's report "or even to investigate the reported condition." Id. at 162–63; see 49 U.S.C. 20109(b)(1)(A). We adopt Ziparo's conclusion that:

> If the railroad concludes that the report does not really create a safety or security concern, it remains free to dismiss the report entirely. To avoid liability, it need only refrain from punishing the employee making the report.

15 F.4th at 163.

Section 20109(b)(1)(A) protects an employee who makes a good faith report; the employee is not entitled to stop working. Should that occur the employee's conduct would fall within the refusal-to-work provision, with its higher standard and multiple conditions to FRSA anti-retaliation protection. See 49 U.S.C. §§ 20109(b)(1)(B), 20109(b)(2)(A)–(C). As explained above, for protection under the FRSA, an employee who refuses to work must be confronted by a hazardous safety condition related to the performance of the employee's duties. The refusal must be made in good faith, and the employee must have no reasonable alternative to refusing to work. Moreover, the refusal-to-work provision requires objective reasonableness—that a reasonable individual would conclude that the hazardous condition presents an imminent danger of death or serious injury that is so urgent there is no time to eliminate the danger. Congress weighed the higher cost of an employee's refusal to work—which results in staffing issues and disruption of the work day—against the benefit of such refusal, ultimately deciding to provide anti-retaliation protection only in limited, serious, and time-sensitive circumstances. The FRSA thus "does not throw one set of interests to the winds in order to protect the other; it is a compromise between them. And it should not be surprising that Congress has struck the balance in different ways at different times." Neal, 33 F.3d at 863.

To the extent BNSF argues that the FRSA anti-retaliation provision should be read to include an objective reasonableness component because one is included within the Sarbanes-Oxley Act's anti-retaliation provision, we note the differences in the statutory language. The Sarbanes-Oxley Act protects against retaliation because of "any lawful act done by the employee . . . to provide information . . . regarding any conduct which the employee *reasonably believes* constitutes a violation" of certain federal laws and regulations. 18 U.S.C. § 1514A(a)(1) (emphasis added). Unlike the FRSA, then, the plain language of the Sarbanes-Oxley Act requires a reasonable belief. See also 12 U.S.C. § 5567(a)(1) (provision in the Consumer Protection Act forbidding retaliation against an employee for providing

information "that the employee reasonably believes to be a violation of" certain federal laws).

Having concluded that the reporting provision does not contain an objective reasonableness requirement, we turn to BNSF's argument that Monohon did not report a hazardous safety condition. BNSF contends that the statute requires an existing, physical, tangible hazardous safety condition that can be remediated.

We first consider the word "condition." As used in the FRSA's anti-retaliation provisions, the ordinary meaning of "condition" is "a state of being." Condition, Merriam-Webster's Collegiate Dictionary (11th ed. 2014). According to Monohon's theory of the case, the condition at issue here was that of wearing a seatbelt while hy-railing. Wearing a seatbelt was a state of being that also met BNSF's definition because it existed, was physical and tangible, and was capable of being remedied. See Ziparo, 15 F.4th at 164 (rejecting the railroad's argument that the FRSA protects only "reports of physical conditions" and explaining that the FRSA protection is limited to conditions that "involv[e] the operation of the railroad" and that are "within the control of the railroad to remedy").

BNSF argues that the statute requires evidence of an "actual" hazardous safety condition, i.e., proof that the danger presented by the condition had been realized. E.g., Foster v. BNSF Ry. Co., 866 F.3d 962, 964, 968 (8th Cir. 2017) (employees reported unsafe bridge conditions after seeing crew member fall off the bridge to the road below). The statute does not require that an accident or injury have occurred, however. In the above-cited Kuduk v. BNSF Railway Co. case, an employee invoked the railroad's Safety Issue Resolution Process (SIRP), reporting "that a flop-over handle used to derail cars was too heavy and could cause employee back injuries." 768 F.3d at 789. There was no mention that the handle actually had caused injury, but we nonetheless held that there was a factual dispute whether the report constituted a report of a hazardous safety condition. See id. at 790. ("Kuduk testified that he

-13-

made the report because he 'was concerned that someone could hurt their back in trying to lift [the handle],' and the SIRP records would permit a reasonable jury to find that BNSF understood Kuduk's complaint regarding the handle to be, at bottom, a safety report." (alteration in original)). The present case likewise presented a question of fact: Was Monohon's report regarding the danger of wearing a seatbelt while hy-railing a report of a hazardous safety condition? The jury found that it was.

We conclude that there existed a "legally sufficient evidentiary basis to" support the jury's finding. Monohon presented evidence to support the following facts. Track inspectors are taught to expect a train at any time from any direction. Sight lines and track curvature can make it difficult to discern which track a train is using. Hy-rails cannot swerve from the tracks, nor can they be stopped quickly. Although both trains and hy-rails are supposed to operate within the boundaries authorized by the railroad, errors and misunderstandings cause trains and hy-rails to be outside their authority (*i.e.*, railroad speak for being in an area or traveling in a direction they have not been given permission to be in or in which to travel). There have been incidents of hy-rails colliding with or nearly colliding with trains, because either the hy-rail or the train was outside its authority. Wearing a seatbelt while hy-railing can impede an inspector's ability to bail out of a hy-rail. Considering the evidence and all reasonable inferences in favor of Monohon, we cannot conclude that there was "a complete absence of probative facts" such that no reasonable juror could have found that wearing a seatbelt while hy-railing is a hazardous safety condition. See Lavender v. Kurn, 327 U.S. 645, 653 (1946); cf. Gateway Coal Co. v. United Mine Workers of Am., 414 U.S. 368, 385–87 (1974) (union failed to present any objective evidence of abnormally dangerous condition); NLRB v. Fruin-Colnon Constr. Co., 330 F.2d 885, 892 (8th Cir. 1964) (no substantial evidence of abnormally dangerous condition when evidence consisted only of "isolated testimony of the alleged discriminatees and unreasonable inferences").

We also conclude that the evidence was sufficient to support the finding that Knapp intentionally retaliated against Monohon. Knapp testified that he terminated Monohon for not wearing his seatbelt and for being insubordinate. Knapp considered the hearing officer's report, which found that Monohon was insubordinate for reporting his seatbelt concern to Anderson. Monohon also presented evidence that BNSF had not terminated employees for violating the seatbelt rule, that he had not disobeyed any orders, and that he had not acted in an incorrigible manner when he raised his safety concern with Anderson. A reasonable jury thus could find that Knapp intended to retaliate against Monohon for reporting, in good faith, a hazardous safety condition.

Because we cannot say that "all of the evidence points in one direction and is susceptible to no reasonable interpretation supporting the jury verdict," Hunt v. Neb. Pub. Power Dist., 282 F.3d 1021, 1029 (8th Cir. 2002) (citation omitted), we conclude that the district court erred in granting BNSF's renewed motion for judgment as a matter of law. It is "immaterial that [we] might draw a contrary inference or feel that another conclusion is more reasonable." Lavender, 327 U.S. at 653.

## C. New Trial

Monohon argues that the district court abused its discretion in granting BNSF's conditional motion for a new trial under Federal Rule of Civil Procedure 59. Bank of Am., N.A. v. JB Hanna, LLC, 766 F.3d 841, 851 (8th Cir. 2014) (standard of review). "A new trial is warranted when the outcome is against the great weight of the evidence so as to constitute a miscarriage of justice." Id. In its order granting the conditional motion, the district court changed its view of the law from its initially correct determination that the statute requires only a good faith report to its determination that the statute required an objectively reasonable report. The case had been submitted to the jury under the proper view of the law, however. See Ziparo,

15 F.4th at 163 ("[W]e are confident that judges and juries can determine whether a condition meets that [hazardous safety] standard based on the particular facts of the cases before them while taking the FRSA's remedial purpose into account."). When the evidence is considered in light of the fact that the statute does not require objective reasonableness, we conclude that the district court abused its discretion in granting a new trial. See Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990) (a district court abuses its discretion when "it base[s] its ruling on an erroneous view of the law"); Van Steenburgh v. Rival Co., 171 F.3d 1155, 1160 (8th Cir. 1999) ("On a motion for new trial, the district court is entitled to interpret the evidence and judge the credibility of witnesses, but it may not usurp the role of the jury by granting a new trial simply because it believes other inferences and conclusions are more reasonable.").

## D. Damages

Monohon argues that the district court erred in awarding front pay because the FRSA mandates reinstatement. We typically review for abuse of discretion a district court's decision to order front pay, "because reinstatement, or front pay in lieu of reinstatement, are forms of equitable remedies." See Townsend v. Bayer Corp., 774 F.3d 446, 464 (8th Cir. 2014) (footnote omitted). An employee who prevails in a FRSA action, however, "shall be entitled to all relief necessary to make the employee whole." 49 U.S.C. § 20109(e)(1). That relief "shall include" reinstatement. Id. § 20109(e)(2)(A). "A statute's use of the word 'shall' normally deprives a court of discretion in the matter referenced." Townsend, 774 F.3d at 464. We conclude that the FRSA unambiguously requires reinstatement. See Halliburton, Inc. v. Admin. Rev. Bd., 771 F.3d 254, 264 (5th Cir. 2014) (per curiam) (considering identical language in the Sarbanes-Oxley Act and determining that the statute "affords 'all relief necessary to make the employee whole' and such relief 'shall include,' *but is not limited to*, reinstatement, back pay, and certain 'special damages'" (internal citations omitted)).

-16-

This requirement is not absolute, however. BNSF has pointed to examples in which reinstatement would not be possible: if the employee were incapacitated or in prison or if the employer were to have closed its United States operations. Appellee's Br. 54. In those types of cases, the statute gives the district court discretion to award whatever relief is "necessary to make the employee whole." 49 U.S.C. § 20109(e)(1). Moreover, this is not a case, like those BNSF has cited, in which the plaintiff requested or did not challenge an award of front pay. E.g. Deltek, Inc. v. Dep't of Lab., 649 F. App'x 320, 333 (4th Cir. 2016) (unpublished) (considering relief under the Sarbanes-Oxley Act) ("Neither party has appealed the threshold determination that front pay and not reinstatement was the proper remedy in this case, and so the only issue before us is the calculation of the front pay award."). Accordingly, we instruct the district court to reconsider on remand Monohon's request for reinstatement.

## Conclusion

We vacate the judgment in favor of BNSF. We reverse the order granting BNSF's renewed motion for judgment as a matter of law. We remand the case for the reinstatement of the jury's verdict and for the entry of such further relief as is consistent with the views set forth in this opinion.

_____