# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-1366

_____

K7 Design Group, Inc.

*Plaintiff - Appellee*

v.

Walmart, Inc., doing business as Sam's Club

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Arkansas

_____

Submitted: January 15, 2025
Filed: July 11, 2025

_____

Before GRASZ, STRAS, and KOBES, Circuit Judges.

_____

GRASZ, Circuit Judge.

This case involves the sale of hand sanitizer between a supplier, K7 Design Group, Inc. (K7), and a retailer, Walmart, Inc., doing business as Sam's Club (Sam's Club), during the COVID-19 pandemic. K7 sued Sam's Club for failing to pay for hand sanitizer that Sam's Club ordered in 2020. A jury ultimately found in K7's favor, concluding Sam's Club and K7 formed one or more contracts for the sale of goods and Sam's Club breached one or more of those contracts. Sam's Club

renewed its motion for judgment as a matter of law and moved for a new trial, but the district court[1] denied these motions. Sam's Club appeals, arguing K7 failed to present sufficient evidence that Sam's Club was obligated to pay for the products at issue, the jury's verdict was against the weight of the evidence, and the district court abused its discretion in instructing the jury. We affirm.

## I. Background

K7 manufactures and designs health, beauty, and sanitizer products. In March 2020, K7 emailed Sam's Club and offered to sell it hand sanitizer. At the time, Jessica Surber was Sam's Club's buyer for health and beauty products, including hand sanitizer.

Shortly after K7 emailed Sam's Club, K7 and Surber began discussing product, price, quantity, and delivery terms for jars of hand sanitizer bearing unicorn-like images (Character Jars). Within a week, Surber emailed K7 informing it to "move forward" with three shipments of Character Jars. That same day, Sam's Club sent a general merchandise agreement (Supplier Agreement) to K7, which K7 signed. Sam's Club required all suppliers conducting business with it to enter into these agreements. The Supplier Agreement did not contain specific product, price, quantity, or delivery terms.

After the Supplier Agreement was executed, Surber asked K7 about ordering other hand sanitizer products. K7 emailed Surber that it could provide Sam's Club with packs of eight-ounce bottles of hand sanitizer (Four Packs) and provided the price, quantity, and delivery terms. Surber emailed K7 and agreed to "take the pallets" of Four Packs on the delivery schedule provided by K7 and stated Sam's Club "need[ed] the product ASAP." A couple of weeks later, Surber emailed K7 about purchasing jars containing one-ounce bottles of hand sanitizer (Cookie Jars).

---

[1]The Honorable Christy D. Comstock, United States Magistrate Judge for the Western District of Arkansas, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

After the parties discussed the price, quantity, and delivery terms of the Cookie Jars, Surber emailed K7 that Sam's Club was "aligned to 67,000 [C]ookie [J]ars."

By the end of April 2020, Surber emailed K7 asking to "extend th[e] buys" of the Four Packs and Cookie Jars. K7 emailed Surber informing her that starting in July it could deliver 250,000 units of the Four Packs per week and 65,000 units of the Cookie Jars per week. Surber stated Sam's Club was "aligned to 250K units of the 4PK/week" and "would like to keep it until the end of September at 250K 4PKs/week." As to the Cookie Jars, Surber emailed K7 that Sam's Club "can take 65K units/week until the end of September as well, then will adjust the forecast as necessary, but will keep the item in [store] until the end of December." Surber also stated Sam's Club would commit to the listed quantities of the Cookie Jars if K7 reduced the cost for all units of the Cookie Jars. In response, K7 sent Surber a spreadsheet of all the products previously ordered and included the additional units of Four Packs and Cookie Jars based on Sam's Club's new requests. The spreadsheet had the previous orders shaded in green, and the new orders shaded in orange. K7 then asked Surber to review the spreadsheet and to "confirm" Sam's Club's requests for the additional units, and it also agreed to reduce the cost of the Cookie Jars, including "the ones currently on order," based on Sam's Club's "commitment." Surber then sent the following email: "Confirmed, we will take all of the units in orange." The "units in orange" included 2,750,000 Four Packs and 455,000 Cookie Jars.

About a month and a half later, K7 offered to sell Sam's Club two kinds of six packs of hand sanitizer (Six Packs). After the parties discussed the product, price, quantity, and delivery terms of the Six Packs, Surber emailed K7 that Sam's Club was "aligned" to purchase five million of the Six Packs "as long as availability was moved up to the beginning of Aug[ust.]"

Between May and July 2020, K7 delivered over 1,000,000 Four Packs, 328,000 Cookie Jars, and 62,000 Character Jars to Sam's Club. Sam's Club paid K7 approximately $17.5 million for the hand sanitizer.

By the summer of 2020, hand sanitizer sales began to decline. In July 2020, K7 emailed Sam's Club asking when it would "ship" the remaining Four Packs, Cookie Jars, and Character Jars. Sam's Club responded that it was "working on" the Four Packs and "may not write the full 612K due to [store] need," and that it would "work on the other 2 items." Whenever K7 asked Sam's Club to "ship" the product, that meant Sam's Club would pick up the product at a specific location based on a purchase order written by Sam's Club for that product. Based on the parties' communications, K7 was a "collect supplier,"[2] which meant that K7 would deliver the hand sanitizer to one of its warehouses and Sam's Club would pick up the hand sanitizer from those warehouses. Sam's Club would then transport the product to its distribution centers and direct the product to its stores based on a different internal purchase order that the distribution centers issued.

At this time, K7 was preparing for products to arrive at its warehouses for collection and, as new product came into its warehouses, the previous deliveries began piling up. K7 continued to ask Sam's Club to pick up the product it had already delivered at K7's warehouses and communicated to Sam's Club that its warehouses were experiencing "space issues." Notwithstanding K7's communications, Sam's Club did not pick up all the hand sanitizer. Surber then emailed K7 that it expected to sell only "20K-25K units/week" and could not "push[] inventory into [stores]." But K7 continued to ask Sam's Club to take the remaining hand sanitizer and stated that it could not "scale back at present – as all goods have been fully produced based off commits." By the end of August 2020, K7 communicated to Sam's Club that it had to move incoming product to other warehouses to accommodate the previously delivered product and needed Sam's Club to pick up the product "asap." But Sam's Club's payments did not keep pace with their orders.

By September 2020, K7 had millions of units of Four Packs, Cookie Jars, and Six Packs at its warehouses and many more in transit to its warehouses. While the

---

[2]"Collect supplier" is a term that Sam's Club itself defined at trial.

hand sanitizer that K7 had delivered to its warehouses was based on orders previously placed by Sam's Club, Sam's Club emailed K7 that "all future orders will be ordered through the system at the terms in the vendor agreement." K7 reminded Sam's Club that Sam's Club had ordered millions of units of hand sanitizer through September 2020. Surber responded stating "that those quantities were the production schedule, not a weekly commitment." K7 then clarified that Sam's Club had requested K7 to ship those products on an expedited schedule, K7 had done so, and K7 now needed Sam's Club to collect that product. Surber stated that once the "items start[ed] selling," Sam's Club would "fill out commitment[s] over time." While Surber communicated to K7 that Sam's Club's stores did not have space for the product, K7 never agreed to store product for Sam's Club in its warehouses.

As a result of the storage issues, the parties began discussing marketing strategies to get the product to sell in Sam's Club's stores. By October 2020, K7 offered to reduce the price of Four Packs and Six Packs by approximately $1.5 million. Surber emailed K7 that Sam's Club "appreciate[d] the cost decrease," but that it was not "in a position to take all of th[e] inventory by 11/15." Instead, Surber asked K7 for a "markdown" of the "inventory currently in [store]" and proposed that a liquidator take the remaining product from K7 at a reduced price. Surber alternatively proposed to sell some of the products through to the next year and asked K7 if it could hold the product until Sam's Club sold it. But K7 communicated to Sam's Club that its warehouses were "being crippled" with Sam's Club's product and needed Sam's Club to collect it. In response, Sam's Club stated that "while we are committed to taking all of the units, we must be able to flow based on sales."

Unable to move product out of its warehouses, K7 escalated the issue to Surber's managers at Sam's Club and provided them with a detailed recitation of all the communications between K7 and Sam's Club regarding product orders. This led to a conference call in which Sam's Club agreed to take 5,200 pallets of the remaining product at a reduced price. After the collection of the 5,200 pallets, K7 emailed Sam's Club asking when it could expect Sam's Club to pick up the remaining product. Over a series of emails, the parties expressed their disagreements

-5-

concerning Sam's Club's commitment to pay for the remaining product. By the end of December 2020, Sam's Club communicated to K7 that it did not anticipate picking up the remaining product and that the remaining product was "K7's to decide on selling, storing, etc."

In April 2021, K7 sued Sam's Club, alleging breach of contract and promissory estoppel. K7 claimed Sam's Club failed to collect and pay for over $15 million worth of product. During the five-day trial, several witnesses testified, including K7's president. Surber and her managers also testified. Sam's Club moved for judgment as a matter of law at the close of K7's case and after its defense. The district court denied its motions. Sam's Club then made several objections to the district court's jury instructions on Arkansas's Uniform Commercial Code (UCC) and proffered its own instructions, which assumed that the Supplier Agreement was the controlling document for the sale of hand sanitizer. The district court rejected Sam's Club's objections and proffered instructions.

The jury ultimately found in favor of K7 on its breach of contract claim and awarded $7,157,426.14 in damages to K7. Sam's Club renewed its motion for judgment as a matter of law and alternatively moved for a new trial. The district court denied these motions. Sam's Club appeals.

## II. Analysis

Sam's Club argues it was entitled to judgment as a matter of law because the terms of the Supplier Agreement did not obligate Sam's Club to pay for the remaining product. Alternatively, Sam's Club argues the district court abused its discretion by denying its motion for a new trial because the jury's verdict was against the weight of the evidence and the jury instructions did not adequately and fairly submit the issues to the jury. We address each motion in turn.

## A. Renewed Motion for Judgment as a Matter of Law

Sam's Club argues the district court erred in denying its renewed motion for judgment as a matter of law as to K7's breach of contract claim. "We review the district court's denial of a motion for judgment as a matter of law de novo and consider the evidence in the light most favorable to the jury's verdict." *Nicholson v. Biomet, Inc.*, 46 F.4th 757, 769 (8th Cir. 2022). "Judgment as a matter of law is only appropriate when no reasonable jury could have found for the nonmoving party." *Monohon v. BNSF Ry. Co.*, 17 F.4th 773, 780 (8th Cir. 2021) (quoting *Southern Wine & Spirits of Nev. v. Mountain Valley Spring Co.*, 646 F.3d 526, 533 (8th Cir. 2011)). "Accordingly, we give high deference to the jury's verdict, drawing all reasonable inferences in favor of the verdict." *Nicholson*, 46 F.4th at 769.

Sam's Club argues "K7 failed to present sufficient evidence that Sam's Club was obligated to purchase the products at issue." Sam's Club claims that before it "could become so obligated" to pay for the hand sanitizer, "an authorized representative of Sam's Club had to issue an 'Order' 'pursuant to and subject to the terms' of the Supplier Agreement." Sam's Club argues that "[b]ecause the evidence at trial showed that Sam's Club never issued an Order for the products at issue, K7 failed to present sufficient evidence of an obligation Sam's Club breached." We disagree. Viewing the evidence in the light most favorable to the verdict, a reasonable jury could have found that the communications between Sam's Club and K7 constituted "Order[s]," obligating Sam's Club to pay for and collect the remaining hand sanitizer.

Under Arkansas law, the essential elements of a contract are: "(1) competent parties, (2) subject matter, (3) legal consideration, (4) mutual agreement, and (5) mutual obligations." *Bowen v. Gardner*, 425 S.W.3d 875, 878 (Ark. Ct. App. 2013). But "an agreement to reach an agreement" is "too vague to enforce," *Troutman Oil Co. v. Lone*, 57 S.W.3d 240, 244 (Ark. Ct. App. 2001), because both "parties must manifest assent to the particular terms of the contract," *Bowen*, 425 S.W.3d at 878. Here, the Supplier Agreement did not specify the products, price, quantities, or

particular delivery terms regarding the parties' transactions. Arkansas's UCC, however, provides for the formation and enforceability of a contract for the sale of goods and applies in determining the meaning of an agreement for the sale of goods. *See* Ark. Code Ann. §§ 4-2-201, 4-2-204; *Church of the Rock - Texarkana v. Ace Signs of Ark., LLC*, 706 S.W.3d 734, 737 (Ark. Ct. App. 2025) ("Article 2 of the UCC applies to 'transactions in goods.'" (quoting Ark. Code Ann. § 4-2-102)). *See, e.g.*, *Bio-Tech Pharmacal, Inc. v. Int'l Bus. Connections, LLC*, 184 S.W.3d 447, 450–51 (Ark. Ct. App. 2004) (concluding a contract for the sale of goods had been formed via purchase orders based on the terms included in the orders and the parties' course of dealing).

Under the Supplier Agreement, "Order" is defined as "any written or electronic purchase order for Merchandise issued by [Sam's Club] through an Authorized Buyer." The Supplier Agreement does not define "purchase order" nor does it detail any other requirements for placing an order beyond that it be "issued pursuant to and subject to the terms of th[e] Agreement." Further, the parties do not dispute that Jessica Surber was Sam's Club's "Authorized Buyer." Rather, the parties dispute whether the communications between Sam's Club and K7 constituted "Order[s]" under the Supplier Agreement.

Here, the jury heard evidence that the Supplier Agreement did not contain specific product, quantity, delivery, or price terms. Rather, the Supplier Agreement contemplated those terms would be supplied in an "Order," and here, those terms were agreed to and provided in various communications between Surber and K7. The jury heard evidence that Sam's Club, through Surber, committed to purchase millions of units of hand sanitizer via email between March and June 2020. In those communications, Surber repeatedly confirmed and agreed to K7's offers of various hand sanitizers with specific prices, quantities, and delivery dates. The jury also heard evidence that Sam's Club failed to pick up and pay for the remaining products it had ordered through those communications. Thus, the evidence, if believed by the jury, was sufficient to warrant a verdict in K7's favor. *See Monohon*, 17 F.4th at 780.

Sam's Club, however, argues its communications with K7 constituted "representations about quantities to be purchased" that were "not binding" and could not impose obligations on Sam's Club. Sam's Club relies on the "No Business Expectation" clause of the Supplier Agreement, which provides that "[p]rojections, past purchasing history and representations about quantities to be purchased are not binding on [Sam's Club], and [Sam's Club] shall not be liable for any act or expenditure . . . by Supplier in reliance on them." Even if some of Surber's initial communications constituted projections and future quantities to be purchased, the jury heard other evidence that Surber, on behalf of Sam's Club, eventually and repeatedly confirmed and committed to K7's offers of various hand sanitizers with specific prices, quantities, and delivery dates. For example, notwithstanding Surber's initial communications regarding the extended buys of the Cookie Jars and Four Packs, she eventually "[c]onfirmed" to take all the units. The jury could have reasonably inferred from the evidence that the communications between Sam's Club and K7 did not constitute projections or representations about quantities to be purchased but instead constituted commitments or confirmations of orders for hand sanitizer. *See Nicholson*, 46 F.4th at 769 (giving "high deference to the jury's verdict, drawing all reasonable inferences in favor of the verdict").

Sam's Club alternatively argues that even if the parties' communications constituted "Order[s]," the Supplier Agreement allowed it to "cancel all or any part of an Order at any time before shipment." Like "purchase order," the Supplier Agreement does not define "shipment." Sam's Club claims that because "none of the products for which K7 sought damages was shipped to Sam's Club," it had no obligation to pay for the products. Sam's Club, however, ignores that K7 tendered the hand sanitizer to Sam's Club at the agreed upon destinations and Sam's Club failed to collect the hand sanitizer. *See generally* Ark. Code Ann. § 4-2-507(1) ("Tender entitles the seller to acceptance of the goods and to payment according to the contract."). Notwithstanding K7's delivery, Sam's Club argues "shipment" meant "shipment to Sam's Club" — not shipment to Sam's Club's distribution centers and stores.

Based on the evidence presented at trial, K7 was a "collect supplier." This meant that after the hand sanitizer arrived in the United States, K7 would ship the hand sanitizer from the port to a designated K7 warehouse where Sam's Club would collect the hand sanitizer. And while Sam's Club argues the Supplier Agreement contemplates suppliers shipping products to Sam's Club, K7 as a "collect supplier" did not ship hand sanitizer to Sam's Club's distribution centers or stores. Instead, Sam's Club agreed that K7 would ship the product to K7 warehouses. Sam's Club would then arrange pick up and transport the product to its distribution centers and stores. The jury also heard evidence that K7 sent weekly updates to Sam's Club concerning production, shipments, and delivery dates, and that despite these communications, Sam's Club failed to collect the product after K7 delivered it. Further, K7's president testified K7 did not produce products until retailers committed to the amount of units they wanted to buy and never told Sam's Club that it would store Sam's Club's products in its warehouses.

The evidence allowed the jury to reasonably infer that shipment occurred when K7 delivered hand sanitizer to Sam's Club at K7's warehouses. Therefore, any right to cancel the hand sanitizer orders would have been dependent on whether K7 delivered it to Sam's Club at one of the K7 warehouses for Sam's Club to collect. Under the Supplier Agreement, if merchandise was not delivered within the time specified, Sam's Club could cancel the order.[3] But Sam's Club does not argue K7 failed to deliver the hand sanitizer on time. Sam's Club also recognizes that a supplier "may ship only after receipt of an Order." Here, the jury heard evidence that K7 would ship the hand sanitizer to the K7 warehouses for Sam's Club to collect after Sam's Club confirmed its orders through email, and once the hand sanitizer was ordered and delivered, Sam's Club would pay the invoice.

---

[3]Though there is at least one email communication where K7 stated Sam's Club could not cancel its initial orders of the Four Packs after confirming them, the parties do not argue whether Sam's Club had a right to cancel pursuant to their communications as to the remaining product.

The jury could have believed either party's witnesses and drawn all reasonable inferences from their testimony to conclude Sam's Club had not canceled its orders of hand sanitizer pursuant to the Supplier Agreement. *See Ryan Data Exch., Ltd. v. Graco, Inc.*, 913 F.3d 726, 732–33 (8th Cir. 2019) (providing the court must deny a renewed motion for judgment as a matter of law "if reasonable persons could differ as to the conclusions to be drawn from the evidence" (quoting *Washington v. Denney*, 900 F.3d 549, 558–59 (8th Cir. 2018))). These factual and credibility determinations were uniquely in the jury's purview and will not be disturbed on appeal. Thus, we affirm the district court's denial of Sam's Club's renewed motion for judgment as a matter of law.[4]

## B. Motion for a New Trial

Alternatively, Sam's Club argues the district court abused its discretion by denying its motion for a new trial because the verdict was against the weight of the evidence and the jury instructions did not adequately and fairly submit the issues to the jury. We review the denial of "a motion for a new trial for abuse of discretion." *Washington*, 900 F.3d at 558 (quoting *Smiley v. Gary Crossley Ford, Inc.*, 859 F.3d 545, 552 (8th Cir. 2017)).

After a jury trial, a "court may, on motion, grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1). "The district court may grant a new trial when the first trial resulted in a miscarriage of justice, through a verdict against the weight of the evidence, an excessive damage award, or legal

---

[4]Sam's Club also argues K7's alternative promissory estoppel claim fails as a matter of law. But because the evidence supports the jury's verdict that Sam's Club and K7 formed one or more contracts for the sale of goods and Sam's Club breached one or more of those contracts, we need not reach the issue of whether Sam's Club was entitled to judgment as a matter of law on K7's promissory estoppel claim. *See Skallerup v. City of Hot Springs*, 309 S.W.3d 196, 201 (Ark. 2009) ("Promissory estoppel applies when the elements of a contract cannot be shown.").

errors at trial." *Trickey v. Kaman Indus. Techs. Corp.*, 705 F.3d 788, 807 (8th Cir. 2013) (citation omitted). When the "basis of the motion for a new trial is that the jury's verdict is against the weight of the evidence, the district court's denial of the motion is virtually unassailable on appeal." *Mich. Millers Mut. Ins. Co. v. Asoyia, Inc.*, 793 F.3d 872, 878 (8th Cir. 2015) (quoting *Wood v. Minn. Mining & Mfg. Co.*, 112 F.3d 306, 311 (8th Cir. 1997)).

Sam's Club first argues the district court abused its discretion in denying its motion for a new trial because the "Supplier Agreement set out exactly how the parties' business relationship would proceed" and "[a]llowing K7 to evade the terms of the agreement it entered constitutes a miscarriage of justice." Sam's Club claims "the Supplier Agreement tilted the evidence overwhelmingly in Sam's Club's favor." But as the district court highlighted, "Sam's Club's renewed Supplier Agreement arguments are not compelling." For the reasons stated above, we agree with the district court's conclusion that there "was substantial evidence from which the jury could reach its verdicts on liability, and the law is clear that a new trial should not be granted where reasonable persons can differ in evaluating credible evidence." (internal quotation marks omitted). *See Mich. Millers*, 793 F.3d at 878; *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992) (explaining the district court was not "free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because [it felt] that other results [were] more reasonable" (quoting *Fireman's Fund Ins. Co. v. Aalco Wrecking Co.*, 466 F.2d 179, 186 (8th Cir. 1972))). Thus, the district court did not abuse its discretion in denying Sam's Club's motion for a new trial on the basis that the jury's verdict was against the weight of the evidence.

Sam's Club next argues the district court abused its discretion by instructing the jury on Arkansas's UCC and refusing to give certain instructions proffered by Sam's Club that provided the Supplier Agreement was the controlling document binding the parties. We review a "district court's decision to reject a proposed jury instruction" and to give particular instructions for abuse of discretion. *Ryan Data*, 913 F.3d at 735 (quoting *Retz v. Seaton*, 741 F.3d 913, 919 (8th Cir. 2014)); *Slathar*

-12-

*v. Sather Trucking Corp.*, 78 F.3d 415, 418–19 (8th Cir. 1996). We consider whether the jury instructions, "taken as a whole and viewed in light of the evidence and applicable law, 'fairly and adequately submitted the issues in the case to the jury.'" *Grain Land Coop v. Kar Kim Farms, Inc.*, 199 F.3d 983, 995 (8th Cir. 1999) (quoting *White v. Honeywell, Inc.*, 141 F.3d 1270, 1278 (8th Cir. 1998)). Even when an instruction is erroneous, we will not reverse the judgment unless the alleged error affects the substantial rights of the party. *Blackorby v. BNSF Ry. Co.*, 849 F.3d 716, 720 (8th Cir. 2017). "The test is not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine those issues." *Gray v. Bicknell*, 86 F.3d 1472, 1485 (8th Cir. 1996) (quoting *Westborough Mall, Inc. v. City of Cape Girardeau*, 794 F.2d 330, 335 (8th Cir. 1986)).

Sam's Club's jury instruction arguments appear to renew the Supplier Agreement arguments we rejected above, which contest the evidence presented to the jury regarding the parties' communications and advance that the Supplier Agreement was the sole binding contract. But we reject Sam's Club's attempt to renew its arguments. Here, the district court instructed the jury under Arkansas's UCC and Model Jury Instructions regarding contracts based on the theories of recovery argued by Sam's Club and K7. Indeed, the district court noted "the parties hotly contested whether emails and other communications formed a contract for the sale of goods" and it was "never disputed that the sale of goods was the foundation for the parties' business relationship." While it concluded Arkansas's UCC applied, the district court also noted that "Sam's Club was free to and did argue that terms contained in the Supplier Agreement precluded the parties' formation of a contract for the sale of goods under the UCC." Thus, in light of the evidence presented to the jury regarding the parties' communications and the applicable law governing the parties' transactions, the district court did not abuse its discretion in instructing the jury according to UCC sales contracts, and contracts generally, as they "fairly and adequately submitted the issues in the case to the jury." *Grain Land Coop*, 199 F.3d at 995 (quoting *White*, 141 F.3d at 1278).

Nor did the district court abuse its discretion by rejecting certain instructions proffered by Sam's Club. In fact, based on the evidence presented to the jury, Sam's Club's proffered instructions would have misled the jury by precluding it from considering whether the parties' communications, in addition to the Supplier Agreement, bound them to supply and pay for hand sanitizer. *See Gray*, 86 F.3d at 1485. The district court explained that while the Supplier Agreement may have supplied "terms affecting the parties' conduct, [it] did not (and does not) view the Supplier Agreement as one for the sale of goods, and instructed under the law governing formation [of] a contract for the sale of goods." Therefore, had the district court instructed the jury according to Sam's Club's proffered instructions, the jury would not have considered the orders placed by Sam's Club, which bound the parties to specific terms regarding the sale of the hand sanitizer. Thus, we affirm the district court's denial of Sam's Club's motion for a new trial.

## III. Conclusion

For the foregoing reasons, we affirm the judgment of the district court.[5]

_____

---

[5]We also affirm the district court's award of prejudgment interest and attorney fees and costs.